IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Brandon Jordan, | ) | Civil Action No. 8:12-cv-01676-DCN-JDA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Carolyn W. Colvin,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a), D.S.C.  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of Defendant Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB").  For the reasons set forth below, it is recommended that the decision of the Commissioner be affirmed.

**PROCEDURAL HISTORY**

In October 2008, Plaintiff filed an application for DIB, alleging an onset of disability date of January 1, 2003.[2]  [R. 98–103.]  The claim was denied initially and on reconsideration by the Social Security Administration ("the Administration").  [R. 74–75, 78–87.]  On October 15, 2009, Plaintiff requested a hearing before an administrative law

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]At the hearing before the ALJ, the Plaintiff amended his alleged onset date to be August 1, 2007.  [R. 11.]

judge ("ALJ") [R. 88–89], and on March 25, 2010, ALJ Ann G. Paschall conducted a de

novo hearing on Plaintiff's claims [R. 29–59].

The ALJ issued a decision on July 28, 2010, finding Plaintiff not disabled under the

Social Security Act ("the Act").  [R. 11–28.]  At Step 1,[3] the ALJ found Plaintiff met the

insured status requirements of the Act through March 31, 2010[4] and had not engaged in

substantial gainful activity since August 1, 2007, his amended alleged onset date.  [R. 13,

Findings 1 & 2.]  At Step 2, the ALJ found Plaintiff had the following severe impairments:

degenerative disc disease, adult attention deficit disorder, bipolar disorder, and anxiety

disorder.   [R. 13, Finding 3.]   The ALJ also determined Plaintiff had non-severe

impairments of possible seizures, obsessive-compulsive disorder, and headaches. [R. 18.]

At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part

404, Subpart P, Appendix 1; the ALJ specifically considered Listings 12.02, 12.04, and

12.06.  [R. 18, Finding 4].

Before addressing Step 4, the ALJ assessed Plaintiff's residual functional capacity

("RFC"):

> I find that, through the date last insured, the claimant had the
> residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b).  I specifically find that he can lift no more
> than 20 pounds at a time occasionally and frequently lift or
> carry objects weighing up to 10 pounds.  He can never use

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

[4]In her decision, the ALJ listed two different dates last insured—March 10, 2010 and March 31, 2010.  [R. 13, Finding 1 (March 31, 2010); R. 13, Finding 2 (March 10, 2010); R. 23, Finding 11 (March 10, 2010).]  In her brief, the Commissioner lists Plaintiff's date last insured as March 31, 2010 [Doc. 16 at 7, 8], and therefore, the Court will use March 31, 2010 as the date last insured.

> ladders, or dangerous machinery.  The claimant should avoid
> unprotected heights.  He can frequently use stairs as well as
> balance, kneel, crouch, and crawl.  He can occasionally stoop.
> I further find that his work should be limited to simple routine
> repetitive one or two step tasks and instructions without a high
> production pace.  He can have occasional public contact.

[R. 20, Finding 5.]  Based on this RFC finding, at Step 4, the ALJ determined Plaintiff was unable to perform his past relevant work.  [R. 22, Finding 6.]  However, at Step 5, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  [R. 22, Finding 10.]  On this basis, the ALJ found Plaintiff had not been under a disability, as defined by the Act, from the alleged onset date through the date last insured.  [R. 23, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision [R. 6], but the Appeals Council declined [R. 1– 5].  Plaintiff filed this action for judicial review on June 18, 2012.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ erred by (1) improperly assessing the opinion of examining physician Dr. Chipman [Doc. 14 at 17–22; Doc. 17 at 1–5]; (2) improperly weighing the opinions of treating physician Dr. Sherbondy, which support a finding of disability [Doc. 14 at 23–27; Doc. 17 at 5–7]; (3) failing to discuss the opinion of examining physician Dr. Bodtorf, which supports a finding of disability [Doc. 14 at 27–28; Doc. 17 at 7–9]; and (4) failing to adopt limitations from the opinion of Dr. Keith, whose opinion the ALJ gave "significant weight" [Doc. 14 at 28–30; Doc. 17 at 9–12].  Plaintiff further contends the Appeals Council erred by failing to properly consider and/or weigh new and

material evidence as required by *Meyer v. Asture*, 662 F.2d 700 (4th Cir. 2011). [Doc. 14 at 30–31; Doc. 17 at 12–13.]

The Commissioner, on the other hand, argues the ALJ's determination that Plaintiff is not disabled within the meaning of the Act is supported by substantial evidence. [Doc. 16 at 9–22.] Specifically, the Commissioner contends the ALJ (1) properly considered all of the medical source opinions of record, as well as Plaintiff's subjective complaints, in finding that Plaintiff's severe physical and mental impairments did not preclude him from performing a reduced range of light work [*id.* at 10–20]; and (2) properly found a significant number of jobs existed in the national economy Plaintiff could perform with his impairments [*id.* at 20–22]. The Commissioner also argues the Appeals Council was not required to consider the new evidence presented by Plaintiff because it was outside the relevant time period and did not show that the ALJ's findings were contrary to the weight of the evidence during the relevant time period. [*Id.* at 19–20.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning

4

mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also  Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the

5

cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision. *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new

6

material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5] With remand under sentence

---

[5] Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No.

six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is

---

2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. § 404.1520. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 404.1572(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575.

**B.**     ***Severe Impairment***

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 404.1521. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B).

**C.**     ***Meets or Equals an Impairment Listed in the Listings of Impairments***

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d).

10

D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. § 404.1560(b).

E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[7] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases

---

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a).

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 404.1569a(a). A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. § 404.1569a(c)(1).

involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in

ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

## III.     Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 404.1527(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th

13

Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 404.1527(d).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.     Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. § 404.1517.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

V.    **Pain**

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs."  *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  Indeed, the Fourth Circuit has

15

rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

### **MEDICAL HISTORY**

Medical records from November 1998 document Plaintiff experienced "unusual episodes" of forgetfulness, getting lost in familiar surroundings, and difficulty concentrating. [R. 196.]  Electroencephalogram ("EEG") testing resulted in normal findings; lateralizing and epileptiform activity were absent.  [*Id.*]  Another EEG in January 1999 resulted in an abnormal recording, indicating a potential partial complex seizure.  [R. 194.]  The reading, however, was otherwise normal.  [R. 195.]

17

In July 2006, Plaintiff was referred to Dr. Glen R. Scott, Jr., of Anderson Neurological Associates to evaluate Plaintiff's problems with confusion and forgetfulness. [R. 187.] On examination, Dr. Scott diagnosed Plaintiff with a mild cognitive impairment with uncertain etiology. [R. 188.] Dr. Scott noted that, at times, Plaintiff was able to do things "in a very unconventional yet efficient manner," but he appeared to be distractible and had a hard time with seemingly simple tasks. [*Id.*]

In August 2006, Dr. Scott indicated Plaintiff had difficulty with multi-step commands and some memory problems, especially registration and recall. [R. 185.] His cranial nerves were intact; motor and sensory were nonlateralizing; and his gait and coordination were normal. [*Id.*] Dr. Scott's impression was mild cognitive impairment/learning disability, and he suggested a trial of therapy with the neurileptic medication Geodon and that Plaintiff enroll in a program, such as at Roger C. Peace, for traumatic brain injury patients. [*Id.*]

In October 2006, Plaintiff returned to Dr. Scott for a follow-up visit after undergoing some computer-based testing that demonstrated dysfunction. [R. 181.] Plaintiff scored below average in everything except memory testing, which was average. [*Id.*] Dr. Scott opined that this result suggested two problems: (1) psychomotor slowing, most likely related to medication effect; and (2) attention deficit problems. [*Id.*] Dr. Scott adjusted Plaintiff's medication and advised Plaintiff regarding a possible job at Walgreens Distribution Center. [*Id.*]

Treatment notes from Plaintiff's December 2006 follow-up visit indicate he most likely suffered from adult attention deficit disorder, with some features of anxiety and mild

obsessive/compulsive disorder.  [R. 180.]  Dr. Scott noted Plaintiff was working through Vocational Rehab for possible training and employment with the Walgreens Distribution Center.  [*Id.*]  Dr. Scott adjusted Plaintiff's medication and provided a letter for Vocational Rehab regarding Plaintiff's cognitive impairment, which stated Plaintiff was "a very capable young man and would be an asset to Walgreen's [sic] as well as the community in general."  [R. 179–80.]

On March 1, 2007, Dr. Scott entered a phone call note in Plaintiff's treatment record. [R. 178.]  Dr. Scott indicated Plaintiff, who was still working at Vocational Rehab, had two "run-ins" with a supervisor and was sent home.  [*Id.*]  Dr. Scott spoke with the mental health employee coach at Vocational Rehab, who stated that lately Plaintiff had been "doing a lot of wandering out of his area" and was "somewhat almost manic at times."  [*Id.*]  Plaintiff told Dr. Scott he had been leaving off some of his medication, and Dr. Scott advised Plaintiff to take his medication as prescribed.  [*Id.*]

At an appointment with Dr. Scott on March 6, 2007, Plaintiff stated he had weaned himself off of two of his medications, and Dr. Scott noted Plaintiff likely needed to restart Klonopin.  [R. 177.]  Plaintiff stated he had an interview the next morning at the Walgreens distribution center, and if that did not work out, he may have an employment opportunity at Michelin.  [*Id.*]  On examination, Dr. Scott noted Plaintiff did not appear tangential or as distracted as he had in the past and was able to stay somewhat on task.  [*Id.*]

Dr. Scott saw Plaintiff again in December 2007 and noted that, while the Walgreen's job had not panned out, Plaintiff had worked as a laborer with a brick mason through the summer and did well with that, but currently, Plaintiff was not working.  [R. 175.]  On

19

examination, Plaintiff was more focused; did not appear to be as distracted or tangential; and seemed to be able to stay with a thought or task. [*Id.*] Dr. Scott's impression was that Plaintiff was doing well, with very mild problems from a cognitive standpoint. [*Id.*] Plaintiff suggested a switch to a medication he had taken in the past, and Dr. Scott agreed "it [was] certainly quite reasonable to consider a break" from the medication Plaintiff had taken for several years. [*Id.*] Dr. Scott provided Plaintiff a titration schedule for the medication switch. [*Id.*] Dr. Scott's treatment notes from an October 2008 appointment do not document any changes in Plaintiff's condition. [R. 263.]

On January 22, 2009, Plaintiff underwent a consultative psychological evaluation by Dr. Brian Keith. [R. 223–27.] With respect to activities of daily living, Plaintiff reported not doing much other than getting on the computer, doing some exercising, and "hang[ing] out with friends"; driving; visiting friends and relatives; and meeting his hygiene needs without assistance. [R. 223.] Plaintiff also reported he could occasionally use a broom or vacuum cleaner; prepare simple meals or dine out a restaurant; go to the bank or post office; wash dishes and clothes; grocery shop; and manage his checking account, with some help from family paying bills because he currently had no income. [*Id.*] Plaintiff indicated his hobbies included watching college football on television, and he occasionally went to the movies and talked on the telephone. [*Id.*] Plaintiff stated he completed high school at a military academy in Georgia and attended college for two years. [R. 224.] He then went to Honduras to teach for five months. [*Id.*] He reported that he last worked in 2007, when he worked for two months at a grocery store stocking shelves; he stated he had held over 50 jobs, and "the jobs just did not work out." [*Id.*]

20

Dr. Keith administered two assessment instruments for psychological testing—the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III) and the Wide Range Achievement Test – Fourth Edition (WRAT-IV).  [R. 225.]  The results of the testing indicated Plaintiff had a full scale IQ score of 89, falling within the upper limits of the low average to average range; a verbal IQ of 95, classified as average; and performance IQ of 83, classified as low average.  [R. 226.] Dr. Keith indicated that all of Plaintiff's sub-test scores fell within the acceptable range.  [*Id.*]  Dr. Keith also indicated that

> [r]elative strengths were noted on the measures of expressive vocabulary, short-term auditory memory, and general and factual knowledge.  Relative weak scores were noted on the measure of visual attention to detail, speed of eye-hand coordination, and nonverbal reasoning.  Overall, cognitive functioning appears to fall within the Low Average to Average range, with a cognitive dispersion pattern somewhat suggestive of an individual who has attention deficit disorder.

[*Id.*]

Dr. Keith's diagnostic impression was depressive disorder NOS; attention deficit hyperactivity disorder, by history.  [*Id.*]  Dr. Keith concluded Plaintiff did not have any social limitations; his overall cognitive skills appeared to fall within the low average to average range with commensurate reading skills; his cognitive skills were sufficient for engaging in a number of activities; and he should have no difficulty managing his own finances. [R. 227.]  Dr. Keith further opined that Plaintiff's

> ADD may make it difficult for him to concentrate and persist without disruption.  Perhaps in a supervised environment, or with frequent breaks, or frequent prompting, [Plaintiff] may find himself able to satisfactorily complete activities.  Again, cognitive skills are sufficient for a number of activities and he should have very little difficulty completing multi-step activities and following detailed directions.

21

[*Id.*]

On January 26, 2009, Plaintiff was examined by Dr. Alanna E. Angel of Due West Family Medicine. [R. 229–30.] Dr. Angel's assessments were (1) cognitive deficits (primary), (2) headache, (3) back pain, (4) ADD, and (5) anxiety disorder, not otherwise specified. [R. 230.] Dr. Angel noted Plaintiff's headaches were mild and not very bothersome; back pain was mild and improved since his back surgery; ADD was helped by medication; and anxiety disorder was helped by medication that clouded Plaintiff's memory, as reported by Plaintiff. [*Id.*]

On February 10, 2009, a Physical Residual Functional Capacity Assessment form was completed by Dr. Dale Van Slooten, who determined Plaintiff could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk and sit about 6 hours in an 8 hour workday, with no limitations in pushing and pulling. [R. 233.] Dr. Van Slooten indicated that no postural, manipulative, visual, communicative, or environmental limitations were established. [R. 234–36.] Dr. Van Slooten concluded Plaintiff's complaints as to the severity of his symptoms were partially credible, specifically because Plaintiff denied seizures, had mild headaches, had minimal back pain with a normal consultative examination, and was given consideration for pain. [R. 237.]

On February 16, 2009, Dr. Craig Horn completed a Psychiatric Review Technique form. [R. 240–53.] Dr. Horn reviewed Listing 12.02 for organic mental disorders and determined Plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria of Listing 12.02, such that an RFC assessment was necessary. [R. 240–41.] Dr. Horn also noted Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining

22

concentration, persistence, or pace; and no episodes of decompensation of extended duration. [R. 250.] Dr. Horn concluded that Plaintiff's testing, activities of daily living,[8] and consultative examination opinion showed Plaintiff had the ability to do simple and semi-detailed tasks, giving him the benefit of the doubt that he may be limited to simple tasks on a sustained basis. [R. 252.] Dr. Horn noted Plaintiff may be too distractible for work with the public and concluded that, although Plaintiff's psychological impairments were severe, his impairments did not preclude simple routine tasks away from the public. [*Id.*]

Dr. Horn also completed a Mental Residual Functional Capacity Assessment form. [R. 254–57.] In his RFC assessment, Dr. Horn indicated Plaintiff is moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to interact appropriately with the general public. [R. 254–55.] Dr. Horn concluded, however, that Plaintiff maintained the following abilities:

> He is able to remember location and work-like procedures. He is able to understand and remember short and simple instructions.
>
> He is able to carry out very short and simple instructions, but could not carry out detailed instructions. He is able to understand normal work-hour requirements and be prompt within reasonable limits. He retains the ability to make simple work-related decisions.
>
> He has the capacity to ask simple questions and request assistance from peers or supervisors. He would perform best in situations that do not require on-going interaction with the public.

---

[8]Dr. Horn indicated Plaintiff's activities of daily living included simple meals, laundry, mowing, vacuuming, driving, shopping for food and clothes, running errands, paying bills, writing checks, reading, attending church, and playing sports with others. [R. 252.]

> He would respond appropriately to changes in a routine
> setting.  He has the ability to be aware of personal safety and
> avoid work hazards.  He retains the capacity to travel to and
> from work using available transportation.

[R. 256.]

On July 2, 2009, Plaintiff saw Dr. Scott in follow up.  [R. 264.]  Dr. Scott noted that, since Plaintiff's last appointment, he had gotten into some trouble and his medications were out of balance.  [*Id.*]  Plaintiff expressed that he needed help and had had suicidal and homicidal ideation.  [*Id.*]  On examination, Plaintiff was mildly agitated and somewhat tangential, but he calmed down for the most part.  [*Id.*]  Dr. Scott's impression was "[n]ew onset of suicidal and homicidal ideation, decompensation," and he noted that it was unclear whether Plaintiff suffered from bipolar disorder rather than ADD.  [*Id.*]  Dr. Scott suggested Plaintiff be stabilized in an inpatient setting, consulted with a psychiatrist, and directed Plaintiff to the emergency department for evaluation by the Access Center.  [*Id.*]

Accordingly, Plaintiff presented to the emergency room.  [R. 274–81.]  A physician documented the following history by Plaintiff:

> Pt states he was having suicidal ideation one week ago.  He
> was in a "near fatal accident".  He was the driver, but denies
> that he was trying to kill himself.  He is no longer having
> suicidal thoughts. Sa[w] neurologist, Dr Scott, today regarding
> head injury from accident.  Dr Scott referred to ED regarding
> suicidal thoughts. Pt denies suicidal thoughts now.  States[]he
> was off depression meds for 4 mos, girlfriend broke w/him, job
> problems.  Has been a psychiatric hospital at GMH since this
> past weekend.  Meds were started there.

[R. 274.]  Plaintiff was discharged in stable condition with a diagnosis of depression and instructions to call a local psychiatrist for an appointment and to return if he started feeling suicidal again.  [R. 275.]

24

On July 8, 2009, Plaintiff was admitted for inpatient treatment. [R. 270–71; *see also* R. 289–90 (inpatient treatment plan).] Treatment notes indicate Plaintiff was referred to inpatient treatment due to a risk of self harm and continued decompensation due to current psychosocial stressors. [R. 270.] On examination at admission, bipolar disorder was ruled out, and Plaintiff was assessed as depressed, with anxiety. [R. 271.] His psychosocial and environmental problems included breaking up with his girlfriend, totaling his truck in a recent motor vehicle accident, and losing his job. [*Id.*] His Global Assessment of Functioning ("GAF") score on admission was 30–35.[9] [*Id.*] Plaintiff was discharged on July 16, 2009. [R. 272–73.] On discharge, his final diagnosis was "[b]ipolar disorder with anxiety and also attention deficit disorder and obsessive-compulsive disorder features," and his GAF score was 60.[10] [R. 272.]

On September 14, 2009, Plaintiff was seen by Dr. Karl Bodtorf for a consultative mental status examination. [R. 295–99.] Dr. Bodtorf concluded it was more probable than not that Plaintiff had difficulty handling typical stressors associated with competitive employment. [R. 298.] Dr. Bodtorf also assessed that Plaintiff appeared to have "mild-to-moderate limitations with respect to independent functioning, moderate limitations with respect to memory/concentration, and mild-to-moderate limitations with respect to

---

[9]A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment is several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Revision 2000) [hereinafter DSM-IV-TR].

[10]A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

social functioning." [*Id.*]  Dr. Bodtorf's diagnostic impressions were bipolar disorder, not otherwise specified, with anxiety; and, by Plaintiff's history, attention deficit hyperactivity disorder, inattentive type.  [R. 299.]

Also on September 14, 2009, Dr. George Chandler completed a Physical Residual Functional Capacity Assessment form.  [R. 301–08.]  Dr. Chandler found Plaintiff was capable of occasionally lifting/carrying 50 pounds; frequently lifting/carrying 25 pounds; and standing/walking and sitting 6 hours in an 8-hour workday, with no limitations with respect to pushing/pulling.  [R. 302.]  Dr. Chandler also found Plaintiff could frequently climb ramps/stairs but could never climb ladders/ropes/scaffolds. [R. 303.] Further, Dr. Chandler found Plaintiff could frequently balance, kneel, crouch, and crawl and occasionally stoop. [*Id.*]  Dr. Chandler noted no manipulative, visual, communicative, or environmental limitations, with the exception of avoiding exposure to hazards.  [R. 304–05.] Dr. Chandler indicated his assessment was based on Plaintiff's history of back surgery, allegations of spells, and levels of physical activity.  [R. 302–03, 306.]

On September 28, 2009, Dr. Larry Clanton completed a Psychiatric Review Technique form, in which he considered Listings 12.02, organic mental disorders; 12.04, affective disorders; and 12.06, anxiety-related disorders. [R. 309–22.] Dr. Clanton noted Plaintiff had medically determinable impairments including ADHD; bipolar disorder, not otherwise specified, and depression disorder, not otherwise specified, and anxiety, but Plaintiff's impairments did not precisely satisfy the criteria of the considered listings. [R. 310, 312, 314.] Dr. Clanton determined Plaintiff had mild restriction in his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of

decompensation, each of extended duration.  [R. 319.]  Dr. Clanton concluded Plaintiff's

"mental symptoms [we]re severe but would not preclude the performance of simple routine

work activities."  [R. 321.]  Dr. Clanton also completed a Mental Residual Functional

Capacity Assessment form, assessing Plaintiff was moderately limited in his ability to

understand and remember detailed instructions; carry out detailed instructions; interact

appropriately with the general public; and set realistic goals or make plans independently

of others.  [R. 323–24.] Dr. Clanton again concluded Plaintiff's symptoms and impairments

were severe but would not preclude simple repetitive work.  [R. 325.]

On March 11, 2010, Plaintiff underwent an independent medical examination by Dr.

Dennis Chipman of Forensic Psychiatric Services.  [R. 327–31.]  Dr. Chipman reviewed

Plaintiff's medical history and interviewed him, noting Plaintiff appeared emotionally

shutdown and had difficulty retrieving dates, which made the interview difficult.  [R. 329.]

Dr. Chipman observed Plaintiff's thoughts were very slow and deliberate but relevant and

goal directed.  [*Id.*]  Dr. Chipman diagnosed Plaintiff with mood disorder, not otherwise

specified, and ADHD, not otherwise specified, probably inattentive type.  [R. 330.]  Dr.

Chipman concluded,

> [T]here appears to be a moderate amount of cognitive
> impairment, probably related to his mood disorder and lack of
> attentional skills, as previously noted by various examiners.
> He would have much difficulty getting through any type of
> workday maintaining pace because of problems with ability to
> maintain persistence and attend to detail.  There is some
> indication that he is quite moody, has anger control problems,
> and would have difficulty getting along with co-workers and
> supervisors.  He also has demonstrated that he is unable to
> maintain persistence in a work setting.  Intensification of the
> stress he is under would likely result in further decompensation
> and worsening of his condition.

27

. . . .

> The condition is chronic and can be expected to last 12 months or more.  If funds are awarded in the patient's behalf, it probably would be best for those funds to be managed initially by a payee, but perhaps later on the patient could manage the funds himself.

[R. 330.]

Additionally, Dr. Shane Sherbondy, in responding to questions from Plaintiff's counsel on April 14, 2010, indicated he had treated Plaintiff since October 15, 2009 for bipolar disorder, and he opined Plaintiff is unable to maintain employment.  [R. 332.]  Dr. Sherbondy concluded that Plaintiff's "mental illness is chronic [and] he will likely not be able to maintain steady employment."  [*Id.*]  Dr. Sherbondy's treatment notes indicate Plaintiff improved from his initial appointment in October 2009 to his appointment at the end of March 2010, except for a period of depression and anxiety at the beginning of March 2010. [R. 334–42.]

## APPLICATION AND ANALYSIS

**The ALJ's Consideration of the Medical Opinions**

Plaintiff contends the ALJ improperly assessed the opinion of examining physician Dr. Chipman; improperly weighed the opinion of treating physician Dr. Sherbondy; failed to discuss the opinion of examining physician Dr. Bodtorf; and failed to adopt limitations from the opinion of consultative psychologist Dr. Keith, whose opinion the ALJ gave "significant weight."  [Doc. 14 at 17–30; Doc. 17 at 1–12.]

The  responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court.  *See Craig*, 76 F.3d at 589; *Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d

at 520.   The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the

following non-exclusive list: (1) whether the physician has examined the applicant, (2) the

treatment relationship between the physician and the applicant, (3) the supportability of the

physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the

physician is a specialist."  *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing

20 C.F.R. § 404.1527).  ALJs typically "accord 'greater weight to the testimony of a treating

physician' because the treating physician has necessarily examined the applicant and has

a treatment relationship with the applicant."  *Id.* (quoting *Mastro*, 270 F.3d at 178).  While

the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with

other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based

on the factors listed in 20 C.F.R. § 404.1527(c).

Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific

reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well
> supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected.  Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in 20 C.F.R. 404.1527 and 416.927.  In
> many cases, a treating source's opinion will be entitled to the
> greatest weight and should be adopted, even if it does not
> meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996).  However, not every opinion offered by a treating

source is entitled to deference:

> Medical sources often offer opinions about whether an
> individual who has applied for title II or title XVI disability
> benefits is "disabled" or "unable to work," or make similar

29

> statements of opinions. In addition, they sometimes offer
> opinions in other work-related terms; for example, about an
> individual's ability to do past relevant work or any other type of
> work. Because these are administrative findings that may
> determine whether an individual is disabled, they are reserved
> to the Commissioner. Such opinions on these issues must not
> be disregarded. However, even when offered by a treating
> source, they can never be entitled to controlling weight or given
> special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(e)

(stating an ALJ does not have to "give any special significance to the source of an opinion

on issues reserved to the Commissioner," such as an opinion that the claimant is disabled,

the claimant's impairments meet or equal a listing, or the claimant has a certain RFC).

### Dr. Chipman

In analyzing the medical opinions, the ALJ afforded little weight to the opinion of

examining physician Dr. Chipman because

> the claimant underwent the examination that formed the basis
> of the opinion in question not in an attempt to seek treatment
> for symptoms, but rather, through attorney referral and in
> connection with an effort to generate evidence for the current
> appeal. Further, Dr. Chipman was presumably paid for the
> report. Although such evidence deserves due consideration,
> the context in which it was produced cannot be entirely
> ignored. Moreover, Dr. Chipman's opinion it is not consistent
> with the longitudinal record.

[R. 22.] The ALJ also noted that Dr. Chipman formed his opinion after examining Plaintiff

one time. [R. 17.]

Thus, contrary to Plaintiff's argument, the ALJ did not discount Dr. Chipman's

opinion solely on the fact that his opinion was provided on attorney referral. [*See* Doc. 14

at 19–20.] While the ALJ considered that the opinion was provided after Plaintiff was

referred by his attorney for an examination, the ALJ also determined that Dr. Chipman's

30

conclusions were contrary to the longitudinal record.  [R. 22.]  The ALJ's conclusion is supported by substantial evidence.

Dr. Chipman, after one examination on March 11, 2010 and his review of an unspecified medical history, opined Plaintiff demonstrated that he is unable to maintain persistence in a work setting and that his condition is chronic and expected to last more than twelve months.  [R. 329–30.]  However, consultative psychologist Dr. Keith, after a psychological examination of Plaintiff in January 2009, found Plaintiff's cognitive skills were sufficient for engaging in a number of activities but that his ADD may make it difficult for him to concentrate and persist without disruption.  [R. 227.]  Dr. Keith also noted that a supervised environment, frequent breaks, or frequent prompting, might help Plaintiff satisfactorily complete activities, but Dr. Keith also emphasized Plaintiff's cognitive abilities were such that he should have very little difficulty completing multi-step activities and following detailed directions.  [*Id.*]  Additionally, Dr. Chandler concluded Plaintiff's impairments would not preclude simple routine or repetitive work.  [R. 321, 325.]  Dr. Horn also concluded Plaintiff could perform simple routine tasks.  [R. 252, 256.]

As stated, it is the ALJ's duty, not the Court's, to weigh competing opinions.  *See Craig*, 76 F.3d at 589.  In this case, the ALJ considered the proper factors for weighing medical opinions as outlined in 20 C.F.R. § 404.1527 and discounted Dr. Chipman's opinion, not only because it was obtained through an attorney referral, but also because it was not obtained for the purpose of treatment and it was inconsistent with the other medical opinions of record.  [*See* R. 14–18, 21.] Therefore, the ALJ's decision with respect to Dr. Chipman's opinion is supported by substantial evidence.

*Dr. Sherbondy*

The ALJ noted treating physician Dr. Sherbondy opined that Plaintiff's "chronic bipolar disorder rendered him unable to maintain steady employment." [R. 18.] The ALJ gave little weight to the opinion of Dr. Sherbondy because it was not supported by his records, which demonstrated Plaintiff continued to improve until the time of the hearing, and whether a claimant is disabled is an issue reserved to the Commissioner. [R. 22.] The ALJ summarized Dr. Sherbondy's records as follows:

> Beginning in October of 2009 the claimant sought treatment from Dr. Shane Sherbondy, a psychiatrist. On October 15, 2009, Dr. Sherbondy noted that the claimant exhibited intact memory, normal attention concentration, normal abstraction, but had limited insight. The claimant's GAF measured 60. Dr. Sherbondy assessed the claimant as exhibiting a normal, logical, and goal directed thought process, with a good mood noted.
>
> On February 3, 2010, the claimant was noted to be "doing well," with a good appetite, energy, and mood. He was also noted to have a full affect, logical thought process, and to be oriented times 4. The claimant was noted to be anxious but without suicidal or homicidal ideation and he denied hallucinations. However, on March 3, 2010 the claimant reported being more depressed, having hurt his shoulder and had not been able to work out. He was noted to have a blunt affect, but with a logical thought process and oriented times 4. Dr. Sherbondy added Pristiq to the claimant's medication regime.
>
> . . . .
>
> Treatment notes dated March 31, 2010; from Dr. Sherbondy, reveal the claimant reported he was "better," with a good appetite, energy, and mood. He was also noted to have a full affect, logical thought process, and to be oriented times 4. The claimant was noted to be anxious but without suicidal or homicidal ideation and he denied hallucinations. Additionally, Dr. Sherbondy noted the absence of psychosis.

[R. 17–18 (internal citations omitted).]

The Court finds no error in the ALJ's weighing of Dr. Sherbondy's April 14, 2010 opinion.  Considering the factors contained in 20 C.F.R. § 404.1527, the ALJ properly discounted Dr. Sherbondy's opinion, not only because the issue of disability is one reserved for the Commissioner, but also because the opinion was not supported by Dr. Sherbondy's own treatment notes.  For example, Dr. Sherbondy's notes reveal that, from October to December 2009, Plaintiff progressed from having limited insight to doing much better to doing very well.  [R. 337–42.]  Other than two appointments in March 2010 where Dr. Sherbondy observed Plaintiff was depressed and anxious, Dr. Sherbondy observed that Plaintiff improved with treatment.  [*See* R. 334–42.]  Accordingly, the ALJ's decision with respect to Dr. Sherbondy's opinion is supported by substantial evidence.

### Dr. Bodtorf

As noted by Plaintiff, the ALJ failed to assign weight to examining physician Dr. Bodtorf's opinion.  However, in discussing the medical record, the ALJ summarized the findings from Dr. Bodtorf's September 2009 mental status examination.  [R. 16–17.]  The ALJ specifically listed the following:

> Dr. Bodtorf noted that the claimant might have difficulty with the typical stressors associated with competitive employment. He opined that the claimant appeared to have mild-to-moderate limitations with respect to independent functioning, moderate limitations with respect to memory/concentration and mild-to-moderate limitations with respect to social functioning.

[R. 17.]

While the ALJ erred by failing to assign weight to Dr. Bodtorf's opinion, *see, e.g.*, *Morales v. Apfel*, 225 F.3d 310, 317–18 (3rd Cir. 2000) (holding the ALJ must explicitly

33

weigh the evidence and explain his rejection of medical opinions), the error is harmless, *see Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating claimant's pain because "he would have reached the same conclusion notwithstanding his initial error"); *see also Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached." (internal quotation marks and citation omitted)).  The ALJ's opinion in this case is consistent with Dr. Bodtorf's opinion.  As the ALJ stated, Dr. Bodtorf concluded Plaintiff had difficulty handling typical stressors associated with competitive employment and "mild-to-moderate limitations with respect to independent functioning, moderate limitation with respect to memory/concentration, and mild-to-moderate limitations with respect to social functioning."  [R. 298.]  The ALJ determined Plaintiff was limited to simple, routine, repetitive, one or two step tasks and instructions without a high production pace and with only occasional public contact.  [R. 20.]  The ALJ also found Plaintiff had mild restriction with respect to activities of daily living; moderate difficulties with respect to social functioning; and moderate difficulties with respect to concentration, persistence, or pace.  [R. 19.]  Thus, the ALJ's decision is consistent with Dr. Bodtorf's opinion.[11]

---

[11] The Court notes that several cases from within this District hold that RFC restrictions like those imposed by the ALJ in this case sufficiently account for a claimant's moderate difficulties in concentration, persistence, or pace.  *See, e.g.*, *Gibbs v. Astrue*, No. 9:09-1081-HFF-BM, 2010 WL 3585502, at *8 (D.S.C. Aug. 2, 2010) (holding that limiting the plaintiff to a low stress setting with no more than occasional decision making or changes in the work setting and no exposure to the general public sufficiently encompassed moderate difficulties in concentration, persistence, or pace), *report and recommendation adopted by* 2010 WL 3585673 (D.S.C. Sept. 13, 2010); *Smith v. Astrue*, No. 9:09-351-SB-BM, 2010 WL 3257738, at *4 (D.S.C. June 4, 2010)

Further, Plaintiff has failed to explain why this error requires reversal or how it would change the ALJ's findings. *See Benton v. Astrue*, No. 0:09-00892-HFF-PJG, 2010 WL 3419276, at *8 n.9 (D.S.C. Apr. 28, 2010) (concluding an alleged error was harmless because the claimant "failed to establish that this error affected the outcome of the case or changed the substance of the decision in any manner"), *report and recommendation adopted by* 2010 WL 3419272 (D.S.C. Aug. 30, 2010). Therefore, the ALJ's failure to explicitly weigh Dr. Bodtorf's opinion is harmless error.

### Dr. Keith

The ALJ gave significant weight to the opinion of consultative psychologist Dr. Keith, finding his opinion to be consistent with the longitudinal record, not exaggerated, and consistent with Plaintiff's RFC. [R. 21.] The Court finds no merit in Plaintiff's objection to the ALJ's giving "significant weight" to Dr. Keith's opinion but failing to include limitations regarding a "supervised environment with frequent breaks or frequent prompting" in the RFC. In his opinion, Dr. Keith noted Plaintiff's cognitive skills were sufficient for engaging in a number of activities, but his attention deficit disorder may make it difficult for him to concentrate and persist without disruption. [R. 227.] Dr. Keith opined that, perhaps in a supervised environment, or with frequent breaks or prompting, Plaintiff might be able to satisfactorily complete activities. [*Id.*] In this same opinion, Dr. Keith stated that Plaintiff's

---

(finding no reversible error where ALJ found the plaintiff had moderate difficulties in maintaining concentration, persistence, or pace and limited the plaintiff to the performance of simple, routine tasks in a supervised environment with no required interaction with the public or team-type interaction with coworkers), *report and recommendation adopted by* 2010 WL 3257736 (D.S.C. Aug. 16, 2010); *see also Wood v. Barnhart*, No. 05-432 SLR, 2006 WL 2583097, at *11 (D. Del. Sept. 7, 2006) ("In restricting plaintiff to jobs with simple instructions, the court concludes that the A.L.J. adequately accounted for the moderate limitation in maintaining concentration, persistence or pace which was identified by both state agency physicians in their psychological evaluations of plaintiff and supported by plaintiff's medical records.").

"cognitive skills were sufficient for a number of activities and that he should have very little difficulty completing multi-step activities and following detailed directions."  [*Id.*]  Reading the opinion in context, the Court does not find that Dr. Keith *required* or even *recommended* that, to be employable, Plaintiff would be limited to a supervised environment, frequent breaks, or frequent prompting.  Therefore, the ALJ's decision with respect to Dr. Keith's opinion is supported by substantial evidence.

**Appeals Council Review**

Plaintiff contends the Appeals Council failed to weigh new and material evidence in accordance with *Meyer v. Astrue*, 662 F.2d 700 (4th Cir. 2011), and thus, Plaintiff is entitled to remand.  [Doc. 14 at 30–31; Doc. 17 at 12–13.]

Even after the ALJ renders a decision, a claimant who has sought review from the Appeals Council may submit evidence to the Appeals Council as part of the process for requesting review of an adverse ALJ decision.  20 C.F.R. § 404.968; *see also id.* § 404.970(b) (stating that the Appeals Council will consider new and material evidence). In *Meyer v. Astrue*, the Fourth Circuit held that

> the regulatory scheme does not require the Appeals Council to do anything more than  . . . "consider new and material evidence . . . in deciding whether to grant review."  *Wilkins* [*v. Sec'y, Dep't of Health & Human Servs.*], 953 F.2d [93,] 95 [(4th Cir. 1991)]; *see also Martinez v. Barnhart*, 444 F.3d 1201, 1207–08 (10th Cir. 2006) (finding "nothing in the statutes or regulations" requires the Appeals Council to articulate its reasoning when "new evidence is submitted and the Appeals Council denies review"); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992) (rejecting contention that Appeals Council must "make its own finding" and "articulate its own assessment" as to new evidence when denying review); *Damato v. Sullivan*, 945 F.2d 982, 988–89 (7th Cir. 1992) (holding that "the Appeals Council may deny review without

36

> articulating its reasoning" even when new and material
> evidence is submitted to it).

662 F.3d 700, 706 (4th Cir. 2011) (footnote omitted).  However, the court went on to note,

> Although the regulatory scheme does not require the
> Appeals Council to articulate any findings when it considers
> new evidence and denies review, we are certainly mindful that
> "an express analysis of the Appeals Council's determination
> would [be] helpful for purposes of judicial review." *Martinez*,
> 444 F.3d at 1207–08; *see also Damato*, 945 F.2d at 989 n.6
> (noting that in "fairness to the party appealing the ALJ's
> decision, the Appeals Council should articulate its reasoning"
> when it rejects new material evidence and denies review).

*Id.*

The Fourth Circuit then observed that a lack of additional fact finding by the Appeals

Council would not render judicial review impossible if the record contained an adequate

explanation of the Commissioner's decision.  *Id.* at 707 (citation omitted).  However, turning

to the facts of the case before it, the Fourth Circuit noted the evidence was not one-sided,

and the court "simply [could ]not determine whether substantial evidence support[ed] the

ALJ's denial of benefits."  *Id.*  Specifically, as to the opinion of the claimant's treating

physician submitted to the Appeals Council, "no fact finder ha[d] made any findings as to

the treating physician's opinion or attempted to reconcile that evidence with the conflicting

and supporting evidence in the record."  *Id.*  Consequently, the Fourth Circuit concluded

the case must be remanded for further fact finding because "[a]ssessing the probative

value of competing evidence is quintessentially the role of the fact finder," a job a reviewing

court "cannot undertake [] in the first instance."  *Id.*

Pursuant to 20 C.F.R. § 404.970(b),

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

Evidence is new "if it is not duplicative or cumulative." *Wilkins*, 953 F.2d at 96 (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)).  "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* When a claimant seeks to present new evidence to the Appeals Council, he is not required to show good cause for failing to present the evidence earlier. *Id.* at 96 n.3.

In its decision denying review, the Appeals Council incorporated into the record medical records from Sherbondy's Psychiatric Services dated April 22, 2010 through September 7, 2010.  [R. 5.] The additional treatment notes provided by Dr. Sherbondy—to the extent they can be deciphered—indicate that, during this time period, Plaintiff's energy, mood, sleep, and appetite ranged from fair to good; his thought processes were logical; his medicine was helpful, e.g., "feeling better physically and work out more"; he moved to his own home; he felt better; and he felt much better, with a more stable mood, when taking a combination of Seroquel and Lithium.  [R. 344–46.]  The records also contain a note indicating Plaintiff was diagnosed with bipolar disorder, which has been a disabling condition for him.  [R. 347.]

Considering the ALJ's decision in light of the new evidence, the Court has failed to discern a basis for remanding this case for further fact finding because the new evidence

38

is consistent with the evidence before the ALJ.[12]  *See Meyer*, 662 F.3d at 707 (remanding case for the fact finder—the ALJ—to reconcile the new evidence with conflicting and supporting evidence in the record).  There is nothing in the new evidence that was not previously considered by the ALJ, and the new evidence does not contradict the ALJ's finding that Plaintiff's condition improved with treatment during the relevant time period.  [*See* R. 14–22.]  Accordingly, the new evidence is consistent with the evidence before the ALJ, and the Court concludes the new evidence presented to the Appeals Council would not change the ALJ's opinion.  Thus, the ALJ's decision is supported by substantial evidence, even in light of the new evidence.

## CONCLUSION AND RECOMMENDATION

Wherefore, based on the foregoing, it is recommended that the decision of the Commissioner be AFFIRMED.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

July 31, 2013
Greenville, South Carolina

---

[12]The Court also notes that the records submitted to the Appeals Council are all dated after Plaintiff's date last insured of March 31, 2010, and to receive benefits, a claimant must establish that he was disabled prior to his date last insured.  *See, e.g.*, *Johnson v. Barnhart*, 434 F.3d 650, 655–56 (4th Cir. 2005) (citing 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a)).  However, "an ALJ must give retrospective consideration to medical evidence created after a claimant's last insured date when such evidence may be 'reflective of a possible earlier and progressive degeneration.'"  *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 345 (4th Cir. 2012) (quoting *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)).  Further, "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms."  *Id.* at 341 (quoting *Moore*, 418 F.2d at 1226).  Here, the additional records document treatment Plaintiff received from a physician he saw before his date last insured for conditions that were diagnosed prior to his date last insured.  Further, the additional treatment, which occurred between April 2010 and September 2010, was rendered shortly after Plaintiff's insured status expired on March 31, 2010.  Accordingly, that the records are dated after Plaintiff's date last insured is not a sufficient basis to conclude no further fact finding is necessary.