IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| BRANDON JORDAN, ) | |
| ) | No. 8:12-cv-01676-DCN |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| CAROLYN W. COLVIN, *Acting* ) | |
| *Commissioner of Social Security*,[1] ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on Magistrate Judge Jacquelyn D. Austin's Report and Recommendation ("R&R") that this court affirm Acting Commissioner of Social Security Carolyn Colvin's decision denying plaintiff's application for disability insurance benefits ("DIB"). Plaintiff filed objections to the R&R. For the reasons set forth below, the court rejects the R&R and remands the case for further administrative proceedings.

## I. BACKGROUND

### A. Procedural History

Plaintiff Brandon Jordan ("Jordan") filed an application for DIB on October 24, 2008, alleging disability beginning August 1, 2007.[2] Tr. 98-103. The Social Security Administration ("the Agency") denied Jordan's claim initially and on reconsideration. Tr. 78-87. Jordan requested a hearing before an administrative law judge ("ALJ"), and ALJ Ann G. Paschall held a hearing on March 25, 2010. Tr. 11, 88-89. The ALJ issued a decision on July 28, 2010, finding Jordan not disabled under the Social Security Act.

---

[1] Carolyn W. Colvin became the Acting commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this lawsuit.

[2] Jordan originally alleged an onset date of January 1, 2003, but amended the date to August 1, 2007, at the ALJ hearing. See Tr. 55.

1

Tr. 11-24.  Jordan requested Appeals Council review of the ALJ's decision.  Tr. 6.  The Appeals Council declined to review the decision, rendering the ALJ's decision the final action of the Commissioner.  Tr. 1-5.

On June 18, 2012, Jordan filed a civil action seeking review of the ALJ's decision.  The magistrate judge issued an R&R on July 31, 2013, recommending that this court affirm the ALJ's decision.  R&R 39, ECF No. 19.  Jordan filed objections to the R&R on August 19, 2013.  The Commissioner replied to Jordan's objections on September 6, 2013.

### B.     Medical History

On November 24, 1998, Jordan underwent an electroencephalogram ("EEG") after experiencing "unusual" episodes of forgetfulness, getting lost in familiar surroundings, and difficulty concentrating.  Tr. 196.  The results of the EEG were normal.  Id.  Another EEG in January 1999 resulted in an abnormal recording, indicating a potential partial complex seizure.  Tr. 194.  However, the reading was otherwise normal.  Tr. 195.  Jordan did report that his mother thought he had a spell that same night.  Tr. 194.

In July 2006, Jordan was referred to Dr. Glen Scott, Jr., a neurologist, to evaluate Jordan's problems with confusion and forgetfulness.  Tr. 187.  Jordan reported an eighteen month history of having increasing problems with confusion.  Id.  After examination, Dr. Scott diagnosed Jordan with a mild cognitive impairment of uncertain etiology.  Tr. 188.  Dr. Scott noted that, at times, Jordan was able to do things in a "very unconventional yet efficient matter," but appeared to be distractible and had a hard time with seemingly simple tasks.  Id.  In August 2006, Dr. Scott indicated that Jordan had

difficulty with multi-step commands and some memory problems, especially registration and recall. Tr. 185. Dr. Scott's impression was mild cognitive impairment/learning disability, and he suggested a trial of therapy and that Jordan enroll in a program for traumatic brain injury patients. Id. On October 12, 2006, Dr. Scott noted the results of a computer-based test demonstrated dysfunction. Tr. 181. Jordan scored below average in everything except memory testing, which was average. Id. According to Dr. Scott, this result suggested attention deficit problems. Id.

On December 5, 2006, Dr. Scott indicated that Jordan most likely suffered from adult attention deficit disorder ("ADD"), with some features of anxiety and mild obsessive-compulsive disorder. Tr. 180. He noted that Jordan was working through Vocational Rehab for possible training and employment with the Walgreens Distribution Center. Id. Dr. Scott wrote a letter to Vocational Rehab, which stated Jordan was "a very capable young man and would be an asset to Walgreen's [sic] as well as the community in general." Tr. 179. On March 1, 2007, Dr. Scott indicated that Jordan had two "run-ins" with a supervisor at Vocational Rehab, and a mental health employee coach told Dr. Scott that Jordan had been "doing a lot of wandering out of his area" and was "somewhat almost manic at times." Tr. 178. Dr. Scott saw Jordan again on December 20, 2007, and noted that he was doing well, with very mild problems from a cognitive standpoint. Tr. 175. At that visit Jordan was more focused and able to stay with a thought or task. Id. Dr. Scott indicated that Jordan's problems were consistent with adult ADD, obsessive-compulsive traits, and "potentially a little bit of mania although not bad." Id.

On January 22, 2009, Jordan underwent an evaluation by Dr. Brian Keith, an Agency psychological consultant. Tr. 223-27. When asked about his daily activities, Jordan reported not doing much other than getting on the computer, exercising, and hanging out with friends. Tr. 223. Jordan reported being able to prepare simple meals or dine out in a restaurant; occasionally use a broom or vacuum cleaner; go to the bank and post office; drive to visit friends and relatives; wash dishes and clothes; meet his hygiene needs without assistance; and manage his checking account. Id.

Dr. Keith administered two assessments – the Wechsler Adult Intelligence Scale – Third Edition ("WAIS-III") and the Wide Range Achievement Test – Fourth Edition ("WRAT-IV"). Tr. 225. The results of the WAIS-III indicated Jordan had a full scale IQ score of 89, falling within the upper limits of the low average to average range; a verbal IQ of 95, classified as average; and a performance IQ of 83, classified as low average. Tr. 226. Dr. Keith noted that all scores fell within the acceptable range, and that "overall cognitive functioning appears to fall within the Low Average to Average range, with a cognitive dispersion pattern somewhat suggestive of an individual who has [ADD]." Id. The results of the WRAT-IV indicated an 11.9 basic reading level, commensurate with Jordan's education background.[3] Id.

Dr. Keith concluded that Jordan did not appear to have any social limitations and that overall, cognitive skills appeared to fall within the low average to average range with commensurate reading skills. Tr. 227. Additionally, Dr. Keith noted that Jordan's cognitive skills were sufficient for engaging in a number of activities, but that "his ADD may make it difficult for him to concentrate and persist without disruption." Id. Dr. Keith also noted that "perhaps in a supervised environment, or with frequent breaks, or

---

[3] Jordan graduated from high school and attended college for two years. Tr. 187, 224.

frequent prompting, Mr. Jordan may find himself able to satisfactorily complete activities," indicating that Jordan "should have very little difficulty completing multi-step activities and following detailed directions." Id.

At the request of the Commissioner, Jordan was examined by physician Alanna E. Angel on January 26, 2009. Tr. 229-30. Dr. Angel assessed the following: (1) cognitive deficits (primary), (2) headache, (3) back pain, (4) ADD, and (5) anxiety disorder, not otherwise specified. Tr. 230. Dr. Angel noted that Jordan's headaches were mild and not very bothersome; his back pain was mild and improved since back surgery; his ADD was helped by medication; and his anxiety disorder was helped by medication, but Jordan reported that the medication clouded his memory. Id.

On July 2, 2009, Jordan again saw Dr. Scott. Tr. 264. Jordan expressed that he needed help because he was having suicidal and homicidal ideation. Id. Dr. Scott recommended Jordan be stabilized in an inpatient setting. Id. That same day Jordan went to the emergency room at AnMed Health Medical Center, where a physician documented that Jordan stated he was having suicidal ideation a week earlier and had been in a "near fatal accident" while driving, although he denied that he was trying to kill himself. Tr. 274. Jordan told the physician that he was no longer having suicidal thoughts. Id. Jordan reported that he had been off of depression medication for four months, his girlfriend had recently broken up with him, and that he was having job problems. Id. Jordan was discharged the same day in stable condition. Tr. 275.

On July 8, 2009, Jordan was admitted to inpatient treatment at AnMed Health. Tr. 270-71. On intake, bipolar disorder was ruled out, and Jordan was assessed as depressed, with anxiety. Tr. 271. His Global Assessment of Functioning ("GAF") score

5

on admission was 30-35.[4]  Id.  Jordan was discharged on July 16, 2000.  Tr. 272-73.  Jordan's final diagnosis was bipolar disorder with anxiety and also ADD and obsessive-compulsive disorder features, and his GAF score on discharge was 60.  Tr. 272.

On September 14, 2009, Jordan was seen by Dr. Karl Bodtorf, a psychologist, for a consultative mental status examination at the request of the Commissioner.  Tr. 294-99.  Dr. Bodtorf concluded that it was "more probable than not that Brandon does have difficulty handling typical stressors associated with competitive employment."  Tr. 298.  Dr. Bodtorf also assessed that Jordan appeared to have mild-to-moderate limitations with respect to independent functioning; moderate limitations with respect to memory and concentration; and mild-to-moderate limitations with respect to social functioning.  Id.  Dr. Bodtorf diagnosed Jordan with bipolar disorder with anxiety as well as attention deficit hyperactivity disorder ("ADHD"), inattentive type.  Tr. 299.

Beginning in October 2009, Jordan sought treatment from Dr. Shane Sherbondy, a psychiatrist.  Tr. 332.  On October 15, 2009, Dr. Sherbondy noted anxiety, bipolar disorder, limited insight, and a GAF score of 60.  Tr. 342.  On November 17, 2009, Dr. Sherbondy noted Jordan's subjective condition was "good" and found that Jordan was "doing much better."  Id.  On December 1, 2009, Dr. Sherbondy noted that although

---

[4] A GAF score is

> a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood.  A GAF of 41 to 50 means that the patient has serious symptoms . . . [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

White v. Comm'r of Soc. Sec., 572 F.3d 272, 276 (6th Cir. 2009) (internal citations omitted).

Jordan was still having anxiety, he was "doing very well." Tr. 337. Dr. Sherbondy's notes from four visits spanning from December 2009 to February 2010 indicate that Jordan was either subjectively "good," doing "well," or doing "ok" at each of these visits, although he was still experiencing anxiety. Tr. 337-35.

On March 3, 2010, Dr. Sherbondy noted that Jordan was "more depressed" and that he had recently hurt his shoulder and could not work out. Tr. 335. Jordan remained depressed at a March 16, 2010, visit to Dr. Sherbondy. Tr. 334. However, on March 31, 2010, Dr. Sherbondy noted that Jordan's "overall mood [was] better." Id. In responding to questions from Jordan's counsel on April 14, 2010, Dr. Sherbondy opined that Jordan's "mental illness is chronic [and] he will likely not be able to maintain steady employment." Tr. 332.

On March 11, 2010, Jordan underwent an independent medical examination by Dr. Dennis Chipman, a psychiatrist. Tr. 327-31. Dr. Chipman, after reviewing Jordan's medical history and interviewing him, diagnosed Jordan with mood disorder and ADHD. Tr. 330. He concluded that Jordan would "have much difficulty getting through any type of work day maintaining pace because of problems with ability to maintain persistence and attend to detail." Id. Dr. Chipman also noted that there is some indication that Jordan "would have difficulty getting along with co-workers and supervisors" and that "intensification of the stress he is under would likely result in further decompensation and worsening of his condition." Id. Dr. Chipman also determined that the condition is "chronic and can be expected to last 12 months or more." Tr. 331.

### C. Opinion Evidence

On February 10, 2009, Dr. Dale Van Slooten, an Agency consulting physician, completed a physical residual functional capacity ("RFC") assessment. Tr. 232-39. Dr. Van Slooten determined that Jordan could lift 50 pounds occasionally and 25 pounds frequently; stand and walk for at least six hours in an eight-hour workday; and sit at least six hours in an eight-hour work day. Tr. 233. Dr. Van Slooten also indicated that no postural, manipulative, visual, communicative, or environmental limitations were established. Tr. 234-36.

On February 16, 2009, Dr. Craig Horn, an Agency consulting psychologist, completed a psychiatric review technique form ("PRTF") and a mental RFC assessment. Tr. 240-53, 255-57. Dr. Horn noted that Jordan had mild restrictions in activities of daily living, as well as moderate difficulties maintaining social functioning, concentration, persistence, and pace. Tr. 250. Dr. Horn indicated Jordan is moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to interact appropriately with the general public. Tr. 254-55. Dr. Horn noted that Jordan was able to remember work-like procedures, understand and carry out very short and simple instructions, understand work-hour requirements, be prompt within reasonable limits, and make simple work-related decisions. Tr. 256. Dr. Horn concluded that Jordan had the ability to do simple and semi-detailed tasks, giving him the benefit of the doubt that he may be limited to simple tasks on a sustained basis. Tr. 252. Dr. Horn noted Jordan may be too distractible for work with the public and concluded that, although Jordan's

psychological impairments were severe, his impairments did not preclude simple routine tasks away from the public.  Tr. 252, 256.

On September 14, 2009, Dr. George Chandler, an Agency consulting physician, completed a physical RFC assessment.  Tr. 201-08.  Dr. Chandler found Jordan was capable of lifting 50 pounds occasionally and 25 pounds frequently; standing or walking for six hours in an eight-hour work day; and sitting for six hours in an eight-hour workday.  Tr. 203.

On September 28, 2009, Dr. Larry Clanton, an Agency consulting psychologist, completed a PRTF and mental RFC assessment.  Tr. 309-22, 323-34.  Dr. Clanton determined that Jordan was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, and set realistic goals or make plans independently of others.  Tr. 323-34.  Dr. Clanton concluded Jordan's "mental symptoms are severe but would not preclude the performance of simple routine work activities."  Tr. 321, 325.

### D.     ALJ's Decision

The ALJ employed the statutorily-required five-step sequential evaluation process to determine whether Jordan was disabled from August 1, 2007, through March 31, 2010.  The ALJ first determined that Jordan did not engage in substantial gainful activity during the period at issue.  Tr. 13.  Second, the ALJ found that Jordan suffered from the following severe impairments:  degenerative disc disease, adult ADD, bipolar disorder, and anxiety disorder.  Id.  At step three, the ALJ determined that Jordan's combination of impairments did not meet or equal one of the listed impairments in the Agency's Listing of Impairments.  Tr. 18-20.

Before reaching the fourth step, the ALJ made an assessment that Jordan had the RFC to perform light work with several limitations. Tr. 20-22. Specifically, the ALJ determined that Jordan could lift up to 20 pounds occasionally and 10 pounds frequently; never use ladders or dangerous machinery; frequently use the stairs as well as balance, kneel, crouch, and crawl; and occasionally stoop. Tr. 20. The ALJ found that Jordan should avoid unprotected heights. Id. The ALJ further found that his work should be limited to "simple routine repetitive one or two step tasks and instructions without a high production pace," and that Jordan could have "occasional public contact." Id. At the fourth step, the ALJ found that Jordan could not perform his past relevant work. Id. Finally, at the fifth step, the ALJ found Jordan could perform jobs existing in significant numbers in the national economy and concluded Jordan was not disabled during the period at issue. Tr. 22-23.

## II.  STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's R&R to which specific, written objections are made. 28 U.S.C. § 636(b)(1). A party's failure to object is accepted as agreement with the conclusions of the magistrate judge. See Thomas v. Arn, 474 U.S. 140, 149-50 (1985). The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court. Mathews v. Weber, 423 U.S. 261, 270-71 (1976).

Judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907

F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Id. (internal citations omitted). "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." Id. Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]," not on the reviewing court. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citation omitted).

### III.   DISCUSSION

Jordan objects to the R&R on five grounds: (1) the ALJ erred in assessing the opinion of examining physician Dr. Chipman; (2) the ALJ erred in weighing the opinion of treating physician Dr. Sherbondy; (3) the ALJ failed to discuss the opinion of examining physician Dr. Bodtorf; (4) the ALJ failed to adopt limitations from the opinion of Dr. Keith's opinion; and (5) the Appeals Council erred in failing to weigh new and material evidence. Because Jordan's first objection provides grounds for remand, the court need not consider his other objections.

#### A.     Dr. Chipman's Opinion

Jordan's first objection is that the magistrate judge improperly determined that that the "ALJ's decision with respect to Dr. Chipman's opinion is supported by substantial evidence." Pl. Ob. 2. The ALJ afforded Dr. Chipman's opinion "little weight" because Jordan "underwent the examination . . . not in an attempt to seek treatment, . . . but rather, through attorney referral and in connection with an effort to

generate evidence for the current appeal." Tr. 22.  The ALJ also noted that Dr. Chipman's opinion is "not consistent with the longitudinal record."  Id.

### 1.     Attorney Referral

The ALJ's first reason for discounting Dr. Chipman's opinion was the "context in which it was produced" – that it was procured "not in an attempt to seek treatment for symptoms, but rather through an attorney referral and in connection with an effort to generate evidence for the current appeals" and that Dr. Chipman was "presumably paid for the report."  Tr. 22.  Since, as discussed below, the ALJ's inconsistency rationale is insufficient to discount Dr. Chipman's opinion, the court must decide whether the fact that the opinion was based on an attorney referral, in and of itself, is sufficient grounds for discounting the opinion.

Agency regulations require that all medical opinions be considered.  20 C.F.R. § 404.1527(b).  Medical opinions are evaluated pursuant to the following non-exclusive list:

> (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.

Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Generally, the ALJ must "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]."  20 C.F.R. § 404.1527(c)(1).

The court has found no binding case law indicating that an attorney referral alone is substantial evidence sufficient to discount the opinion of an examining physician.[5] Two circuits to face the issue have held that "in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it." Hinton v. Massanari, 13 F. App'x 819, 824 (10th Cir. 2001) (citing Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1995)).  Additionally, another court in this district, while noting that the ALJ had provided some appropriate reasons for discounting a doctor's opinion, stated that "[t]he mere fact that a claimant's representative or attorney arranged to have a medical examination performed should not determine the consideration the ALJ gives that opinion." Cureton v. Astrue, No. 1:09-cv-2342, 2011 WL 903032, at *17 (D.S.C. Jan. 28, 2011), report and recommendation adopted, No. 1:09-cv-2342, 2011 WL 900118 (D.S.C. Mar. 15, 2011) (remanding on other grounds and recommending that, on reconsideration, the "ALJ should not be swayed by the fact that Plaintiff's counsel was involved in having [a doctor] perform the evaluation").

The court does not find the attorney-referral rationale alone to be a sufficient reason to discount Dr. Chipman's opinion.  The court agrees with the Ninth and Tenth Circuits, and with another judge in this district, that "the purpose for which medical reports are obtained does not provide legitimate basis for rejecting them" and that "[a]n examining doctor's findings [should be] entitled to no less weight when the examination

---

[5] Several district court cases in this circuit include attorney referral as one piece of evidence supporting an ALJ's weighting of medical opinions, but each also includes other grounds for discounting the weight given.  See, e.g., Baker v. Astrue, No. 1:11-cv-00040, 2012 WL 517541, at *6 (W.D. Va. Feb. 16, 2012) (finding the ALJ's weighing of a doctor's opinion to be supported by substantial evidence, not only because the evaluation was a "one-time, attorney-referred consultative opinion," but also because opinion was not properly supported by the doctor's objective findings).

13

is procured by the claimant than when it is obtained by the Commissioner."[6] Lester, 81 F.3d at 832; Hinton, 13 F. App'x at 824. The court does not foreclose the possibility that whether a medical opinion is procured by attorney referral may sometimes be a factor in the weight given to that opinion; however, that fact alone is insufficient to establish substantial evidence for discounting the Dr. Chipman's opinion in this case. See Hinton, 13 F. App'x at 824 (holding that an ALJ may "question a doctor's credibility" when the opinion was solicited by counsel but "may not automatically reject the opinion for that reason alone").

### 2. Inconsistency with the Longitudinal Record

The ALJ also afforded Dr. Chipman's opinion little weight because she found that "the opinion is not consistent with the longitudinal record." Tr. 22. That brief statement is both the beginning and the end of the ALJ's inconsistency analysis.

An ALJ's decision must include a discussion of "findings and conclusions, and the reasons or basis therefor, on all material issues of fact, law, or discretion presented . . . ." 5 U.S.C. § 557(c)(3)(A). "Strict adherence to this statutorily-imposed obligation is critical to the appellate review process," and courts have remanded cases where the reasoning for the ALJ's conclusion "is lacking and therefore presents inadequate information to accommodate a thorough review." See v. Wash. Metro. Area Transit Auth., 36 F.3d 375, 384 (4th Cir. 1994) (internal citation omitted). "[A]n explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." Id.

---

[6] It is notable that Dr. Keith was hired by the Commissioner and paid for his evaluation in much the same way Dr. Chipman was hired and paid by Jordan. Tr. 228. However, the ALJ still afforded Dr. Keith's opinion "significant weight." Tr. 21.

14

The ALJ need not set forth her findings in a particular format, see Stephens v. Heckler, 766 F.2d 284, 287-88 (7th Cir. 1985), and the ALJ does lay out Jordan's medical history in some detail.  Tr. 14-18.  Nevertheless, the ALJ's cursory discussion of the weight assigned to Dr. Chipman's opinion presents "inadequate information to accommodate a thorough review."  Wash. Metro, 36 F.3d at 384.  The court cannot divine how Dr. Chipman's opinion is inconsistent with the longitudinal record without further analysis, particularly where there are three examining doctors who appear to provide opinions consistent with Dr. Chipman's.[7]  The court acknowledges that consistency with the record is an important factor in weighing medical opinions, 20 C.F.R. § 404.1527, and does not purport to weigh the evidence, as that is the exclusive task of the ALJ, see Hays, 907 F.2d at 1456.  While a more fully developed decision may ultimately justify the little weight she afforded Dr. Chipman's opinion, the ALJ simply has not provided adequate information for the court to determine whether substantial evidence supports the weight given to Dr. Chipman's opinion.

The case must be remanded because the ALJ's decision inadequately explained how Dr. Chipman's opinion is inconsistent with the record and because attorney referral alone may not alone provide grounds for rejecting medical opinions.  Because the ALJ's analysis of Dr. Chipman's opinion is a sufficient basis for remand, the court need not

---

[7] Assuming the allegedly inconsistent opinion to which the ALJ refers is Dr. Chipman's conclusion that Jordan would "have much difficulty getting through any type of work day maintaining pace because of problems with ability to maintain persistence and attend to detail," Tr. 330, that opinion would seem to be consistent with the opinions of Dr. Keith, to whose opinion the ALJ afforded "significant weight," Tr. 21, and Dr. Bodtorf, whose opinion the ALJ failed to weigh.  See Tr. 227 (Dr. Keith concluding that Jordan's "ADD may make it difficult for him to concentrate and persist without disruption"); Tr. 298 (Dr. Bodtorf concluding "it is more probable than not that Brandon does have difficulty handling typical stressors associated with competitive employment.").  The opinion of Dr. Sherbondy, which the ALJ afforded "little weight," a decision to which Jordan objects, also seems to be consistent with that of Dr. Chipman.  Tr. 332 (considering Jordan's mental illness, Dr. Sherbondy concludes "he will likely not be able to maintain steady employment").

address Jordan's other objections to the R&R. However, the ALJ should consider Jordan's other allegations of error when reviewing the case on remand, particularly the failure to discuss the opinion of Dr. Bodtorf.

### IV.   CONCLUSION

Based on the foregoing, the court **REJECTS** the magistrate judge's R&R, **VACATES** the Commissioner's decision, and **REMANDS** under sentence four of 42 U.S.C. § 405(g) for further proceedings.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 20, 2013**
**Charleston, South Carolina**